1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HAROLD MORALES,

          Petitioner,

    v.

ROSANNE CAMPBELL, Warden

          Respondent.

PEOPLE OF THE STATE OF CALIFORNIA,

          Real Party in Interest.

_____/

No. C 06-06645 MHP

**MEMORANDUM & ORDER**
**Re: Petition for Writ of Habeas Corpus**
**& Motion for Evidentiary Hearing**

        Harold Morales, a prisoner at the Mule Creek State Prison in Ione, California, filed this petition for writ of habeas corpus under 28 U.S.C. section 2254.  This matter is now before the court for consideration on the merits.  For the reasons discussed below, the petition will be DENIED.

OVERVIEW

        On June 30, 1999 the Alameda County District Attorney charged petitioner Morales, pursuant to California Penal Code section 187, with the murder of Nazaneen "Nelva" Omar ("Omar").  The information did not specify whether the charge was for murder in the first or second degree.  Petitioner was also alleged to have used a deadly and dangerous weapon in violation of Penal Code section 12022(b) and to have intentionally and personally inflicted great bodily injury in violation of section 1203.075 and 12022.7(d).  CT 289–90[1].  On October 3, 2002 petitioner waived his right to a jury trial and, following a bench trial, he was convicted of all charges.  Id. at 473;

1  493–94. He was sentenced on February 7, 2003 to a term of twenty-five years to life with the

2  possibility of parole. Id. at 519–20, 553–54.

3      Petitioner pursued state direct appeal and state habeas corpus review with the California

4  Court of Appeal, which affirmed Petitioner's conviction and denied the habeas petition. Resp.'s

5  Opp., Exh.'s. C–I. Most recently, petitioner timely pursued a petition for review with the California

6  Supreme Court. Id., Exh. J. The California Supreme Court dismissed petitioner's claims without

7  prejudice until such time as the Court reached a decision in People v. Cage, case number S127344[2],

8  interpreting the Confrontation Clause of the Sixth Amendment. Id., Exh. K. The issue in Cage was

9  whether an ostensible victim's statements to a police officer in response to general investigative

10  questioning constitutes testimonial hearsay under Crawford v. Washington, 541 U.S. 36 (2004).

11  Petitioner claims the decedent's statements to law enforcement officers were testimonial hearsay and

12  therefore inadmissible because petitioner had no opportunity to cross-examine the declarant.

13      In anticipation of re-filing with the California Supreme Court, petitioner waited one full year

14  subsequent to dismissal, but ultimately bypassed this last stage of state review and filed the petition

15  now before this court on October 25, 2006—immediately prior to the expiration of the period of

16  limitation for such relief. An opinion was subsequently issued in the matter of People v. Cage on

17  April 9, 2007, but the State does not challenge this petition on exhaustion grounds.

18      Petitioner now makes a variety of claims related to his Due Process rights and his right to a

19  fair trial under the Sixth Amendment. He also requests that the court grant a writ of habeas corpus

20  on the basis of cumulative error supported by these claims.

21

22  JURISDICTION AND VENUE

23      This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C.

24  section 2254. 28 U.S.C. § 1331. Petitioner was convicted and sentenced in Alameda county, which

25  lies in the Northern District of California. Therefore, this court has jurisdiction over his claims. 28

26  U.S.C. §§ 84, 2241(d).

27

28

EXHAUSTION

I.     Basic Requirement

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies.  See 28 U.S.C. § 2254(b), (c).  Either by direct appeal or through collateral proceedings, the prisoner must give a state's highest court an opportunity to rule on the merits of each and every claim the prisoner seeks to raise in federal court.  See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

When, however, it would be futile or create undue delay to strictly adhere to the requirement, it is appropriate for a district court to entertain a petitioner's claims on the merits despite incomplete exhaustion.  See 28 U.S.C. § 2254(b)(1)(B) (writ may be granted when "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant").  Moreover, "a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State," although the court is not required to do so.  28 U.S.C. 2254(b)(2); Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).

In analyzing exhaustion, a federal court should evaluate whether a prisoner's claims were exhausted at the time they were filed, rather than when the court ultimately addresses the claims. Brown v. Maass, 11 F.3d 914, 915 (9th Cir. 1993).


II.     Finality of the State Proceedings

Petitioner characterized the dismissal without prejudice by the California Supreme Court of his direct appeal and collateral relief petition as a final decision qualifying for exhaustion purposes pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The State does not challenge this characterization.

This court holds that petitioner's characterization of the dismissal as final is incorrect, but it acknowledges that the statute of limitations imposed by AEDPA created a unique predicament in this action.  The statute mandates that a "1-year period of limitation shall apply to an application for

a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The period of limitation begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Id. § 2244 (d)(1)(A). Here, this period of limitation began to run from the date the California Supreme Court issued its dismissal, October 26, 2005, and ultimately expired prior to the Court's final disposition in Cage, on April 9, 2007. Petitioner filed for relief with this court on October 25, 2006, prior to the expiration of the AEDPA period of limitations. Had he waited for an opportunity to exercise his last available state remedy, he would have forfeited his opportunity to access his federal remedy. See, e.g., Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) (Oregon petitioner who filed for state post-conviction relief within state two-year statutory period was not permitted to proceed on federal habeas action).

This court refuses to make petitioner choose between his state and federal remedies. The exhaustion requirement, while necessary, becomes unduly burdensome if applied in a manner that strips petitioner of his opportunity to seek federal habeas review. Petitioner waited until the last possible day prior to the expiration of the statutory period to file his habeas petition with this court. This demonstrates that he waited in good faith for an opportunity to exercise his state remedy until the final date practicable.

Because of the unique procedural circumstances of the case, this court will review petitioner's claims on the merits. Specifically, the court will review the findings of the California Court of Appeal as to each of petitioner's claims since that court was the last to issue a decision on the merits.

STANDARD OF REVIEW

I.      Habeas Corpus Review

This Court may entertain a petition for writ of habeas corpus "[on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

1  petition may not be granted with respect to any claim that was adjudicated on the merits in state

2  court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary

3  to, or involved an unreasonable application of, clearly established Federal law, as determined by the

4  Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

5  determination of the facts in light of the evidence presented in the State court proceeding." Id. §

6  2254(d).  Petitioner has the burden to prove the violation by a preponderance of the evidence.  Silva

7  v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002).

8       Under AEDPA, state court rulings are to be evaluated under a "highly deferential" standard

9  of review.  Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curium).  Decisions challenged as

10  unreasonable applications of Supreme Court law must not merely be erroneous, but "objectively

11  unreasonable."  Lockyard v. Andrade, 538 U.S. 63, 75 (2003).  Where the state court does not

12  provide a reasoned decision, this court performs "an 'independent review of the record' to ascertain

13  whether the state court decision was objectively unreasonable."  Himes v. Thompson, 336 F.3d 848,

14  853 (9th Cir. 2003) (citing Delgado v. Lewis, 223 F.3d 976, 981–82 (9th Cir. 2000)).

15       Furthermore, this court analyzes claims of harmless error on habeas petitions pursuant to the

16  standard adopted in Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  See Morales v. Woodford,

17  336 F.3d 1136, 1148 (9th Cir. 2003) (applying Brecht review).  The court considers harmful only

18  those errors shown to have a "'substantial and injurious effect or influence in determining a jury's

19  verdict.'"  Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

20  In other words, only error from which petitioner can establish "actual prejudice" will survive

21  harmless error analysis.  Id. (citing People v. Lane, 474 U.S. 438 (1986)).

22       Finally, this court presumes factual findings of a state court to be correct, and the burden

23  falls upon petitioner to rebut this presumption by clear and convincing evidence.  28 U.S.C. §

24  2254(e)(1).  Factual findings made by state courts, whether trial or appellate, are given this

25  deference.  Rushen v. Spain, 464 U.S. 114, 120 (1983) (per curium); Tinsley v. Borg, 895 F.2d 520,

26  526 (9th Cir. 1990).  However, where a petitioner challenges a state court's findings based entirely

27

28

on the state record, the "unreasonable determination" standard of 28 U.S.C. section 2254(d)(2) must be applied. <u>Taylor v. Maddox</u>, 366 F.3d 992 (9th Cir. 2004).

II.    <u>Due Process</u>

Decisions of state courts involving application of state law cannot be upset on federal habeas review unless they "so fatally infected the proceedings as to render them fundamentally unfair" in violation of petitioner's right to due process. <u>Kealohapaule v. Shimoda</u>, 800 F.2d 1463, 1465 (9th Cir. 1986). When a state court applies a state standard stricter or functionally equivalent to a corresponding federal standard, this court will defer to the state court's determination. <u>Stephens v. Hall</u>, 294 F.3d 210, 214–15 (11th Cir. 2002); <u>Cox v. Burger</u>, 398 F.3d 1025, 1030 (8th Cir. 2005); <u>Owens v. Frank</u>, 394 F.3d 490, 501 n.7 (7th Cir. 2005); <u>McCambridge v. Hall</u>, 303 F.3d 24, 35 (1st Cir. 2002).

FACTUAL BACKGROUND

Petitioner dated Omar for approximately two or three years prior to stabbing her to death on October 8, 1998. RT 226, 229. Omar's sister, Zelika, described the relationship between her sister and petitioner as "sick" and "crazy". <u>Id.</u> at 228. At petitioner's trial, she described seeing bruises on her sister and witnessing petitioner verbally abuse Omar. Specifically, she had also listened to numerous voice mail messages petitioner had left for her sister, in which he screamed threats such as "watch out, bitch, I'm going to cut you up. I'm going to fuck you up. I'm going to cut your body, chop you up . . . and you think I'm a fucking joke. I'm not. Just you watch." <u>Id.</u> at 256. She also described petitioner alluding to killing both sisters, saying he had "everything planned out" and "if you're there too, Zelika, I'm going to take care of you too." <u>Id.</u> at 234–58.

Petitioner's stepfather, Paul Lightfoot, who lived with petitioner at the time of the killing, testified that petitioner and Omar used bad language, had problems in their relationship and were mutually abusive both verbally and physically. <u>Id.</u> at 371–74. Lightfoot relayed that prior to the killing petitioner told him that Omar had obtained a restraining order against him and that he was

6

concerned about going to jail over a case Omar had filed against him. Id. at 380–82. About six months prior to the killing, a neighbor witnessed petitioner yell at Omar, grab her and hit her on the head while Omar cried hysterically. Id. at 215–16. On four separate occasions Omar called the police in response to violent or threatening acts by the petitioner. Id. at 58, 62, 141–48, 157–63, 184, 522–37. In addition, Michael Tong, an acquaintance of petitioner, acknowledged having made a statement to the police about an incident in which petitioner told him that he had tried to choke Omar. Id. at 191, 198.

Omar and Zelika both attended Heald College, and Zelika testified that her sister had planned to stop dating petitioner when she started classes, but petitioner had nonetheless remained a part of Omar's life—confronting her at school, following her, and discouraging her from her studies by telling her she was a loser and would not make it through her first quarter. Id. at 254–58. On the day of the killing, Omar had just completed that first quarter. A friend Omar was living with, Wida Akbar, testified that Omar was going out to dinner with petitioner to celebrate. Id. at 277, 279. Akbar also testified that Omar told her that she could not dress up too much or make herself look really beautiful because petitioner would kill her. Id. at 279–80.

Samuel Dorrough heard Omar's screams at 8:00 p.m. He testified he had heard three screams—each cut short—coming seconds apart from a red hatchback, and that the car horn was blowing. Id. at 290–98. After leaving to call 911 and returning to the vicinity of the car, he testified he heard what sounded like someone trying to close a car truck with something preventing the latch from catching. Id. at 298. He saw only a man in the car at this point, and watched the car drive down the street, hesitate, and turn down the road. Id. at 298–302. Other neighbors heard the same horn-honking and screaming. Id. at 475–76. Frank Bryan testified to seeing two people in the car moving around and hearing frantic screaming—a woman yelling, "Oh, God, help," and a man yelling. Id. at 476–78, 491. Bryan heard keys being thrown from the car at one point, saw the man get out, walk around the car and struggle to forcefully close the passenger door. Id. at 478–80.

Janeen Leech and Gary Eoff both saw petitioner run a stop sign while speeding down Redwood Road around 8 p.m. Id. at 319–20, 349–51. Leech heard a thud, saw petitioner get out of

7

1   the car and scoop up what would later be determined to be Omar's body and throw it back in the car.

2   Id. at 323–25. Eoff also saw petitioner bending over to pick a limp, unmoving Omar up off the

3   ground and throw her in the car. Id. at 349–51. After petitioner resumed driving, Leech could see a

4   spatter of red on the passenger window, which prompted her to call 911. Id. at 321–22, 327. When

5   officers arrived at the location, they found a puddle of blood. Id. at 328.

6          Petitioner's stepfather, Lightfoot, was awakened by his wife shortly after these events.

7   Petitioner was in the hallway of their home slicing his throat and wrists with a knife. Id. at 376–77.

8   Lightfoot attempted to physically restrain petitioner, and testified that while doing so, petitioner

9   said, "Please don't stop me. I've done something terrible and the police and going to lock me up."

10  Id. at 378. At that point police officers arrived at the residence. Id. at 379. They recovered the keys

11  to the red hatchback. Id. at 470. Officers who inspected the car found a large amount of blood and a

12  bent knife on the dashboard of the vehicle. Id. at 394–95, 452–54, 497. When officers asked

13  petitioner—who was covered with blood from his self-inflicted wounds, was behaving irrationally

14  and had been strapped to a backboard—the whereabouts of the girl, petitioner was non-responsive.

15  Id. at 421–26, 500–03. After being repeatedly asked, petitioner told the officers that he and his

16  girlfriend had just broken up and that she had overdosed on sleeping pills because she was upset. Id.

17  at 426–28.

18         Omar was eventually found in the back of the hatchback. Id. at 430, 452. An autopsy

19  revealed that Omar had suffered 23 stab and incise wounds to her upper back, left shoulder, left arm,

20  upper chest, lower chest, lower left abdomen and her face and neck. Id. at 93–99. One wound to her

21  upper chest penetrated her lung, which caused bleeding to her chest cavity and leakage of air from

22  her lung, which without medical attention, would have alone been fatal. Id. at 105–06, 132. She

23  also suffered blunt force injuries to her head, face, legs and back, including a skull fracture in the

24  back of her head, consistent with a fall, which alone could also be fatal without immediate medical

25  attention. Id. at 89–90, 104, 106–07. The forensic pathologist determined the cause of Omar's

26  death to be shock and hemorrhage due to the multiple stab and incise wounds and blunt head trauma.

27  Id. at RT 106.

28

DISCUSSION

Petitioner Morales cites four categories of error he believes violated his rights to Due Process in violation of the Fourteenth Amendment and to a fair trial under the Sixth Amendment. He claims: (1) the state trial court made "instructional errors" when determining sentencing; (2) the state trial court erred in its evidentiary rulings—allowing evidence that should have been excluded to be admitted, while excluding admissible evidence; (3) he was unduly prejudiced by prosecutorial misconduct during the closing arguments of his trial; and (4) he received ineffective assistance of counsel. This court will address each category of error in turn, and will then weigh the cumulative effect of any demonstrated errors.

I.     Instructional Errors

As a general matter, "judges are presumed to know the law and to apply it in making their decisions." Walton v. Arizona, 497 U.S. 639, 653 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584 (2002)). A trial court judge need not explain his or her reasoning in reaching a particular decision, Arizona v. Washington, 434 U.S. 497, 517 (1978), and in instances in which the record does not indicate the standards used by the court, the court is presumed to have applied correct legal standards, Wainwright v. Witt, 469 U.S. 412, 431 (1985).

Morales claims the state trial judge erred in the following ways: (1) improperly defined the terms "premeditation," "deliberation"and "unconsidered rash impulse," (2) failed to consider the defense of "unreasonable belief of self defense," (3) incorrectly ruled that there was no evidence of provocation or of a "rash, impulsive act" and (4) improperly required the defense to show evidence of provocation or a rash impulse. The State counters that the trial court judge in this case issued no "instructions" because petitioner waived his right to a jury trial and the court is presumed to have applied correct legal standards. Further, it argues that the trial court applied appropriate legal standards and definitions, considered relevant defenses—including imperfect self defense—and reasonably found no evidence of provocation on the victim's part. The State ultimately asserts that the errors, if any, are harmless.

9

The California Court of Appeal rejected each of petitioners claims relating to reliance on legal error. It found that the trial judge applied appropriate legal standards, reached reasonable conclusions based on the evidence available and sufficiently considered unreasonable self defense. This court considers each of petitioner's claims in turn.

A.   "Premeditation" and "Deliberation"

Petitioner first argues that the trial court erred in its definition of the terms "premeditation" and "deliberation." Without citation to the record, he specifically faults the trial judge for considering petitioner's past deliberations as to whether he should kill his victim as opposed to deliberations related to the particular instance in which he actually killed her. He cites California Jury Instruction ("CALJIC") 8.20[3], which requires "the proposed course of action"—the actual killing—to be "considered beforehand." The portion of the jury instruction petitioner appears to refer to currently reads as follows:

> The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against *the proposed course of action*. The word "premeditated'" means *considered beforehand*. If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

CALJIC 8.20 (emphasis added).

Petitioner also argues that the trial court misapplied a three-category analysis for determining premeditation and deliberation outlined by the California Supreme Court in People v. Anderson, 70 Cal. 2d 15, 26–27 (1968). The Anderson analysis focuses on three types of evidence: (1) planning activity, (2) motive and (3) manner of killing, and that court held that first degree murder is supported "when there is evidence of all three types" or "at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." Id. Petitioner contends that no evidence of either the first or second type existed in the trial record, and that the trial judge improperly considered prior threats he made against Omar not as circumstantial evidence of motive but as proof of premeditation and deliberation. He contends that the abstract desire to kill does not constitute

1   planning activity and that no other evidence of planning activity was presented to the court. And, he

2   argues that because there was no pattern to the cuts and slashes on his victim's body and only a few

3   stabs were deep, the injuries are more consistent with a sudden explosion of violence than a

4   calculated murder.

5   Based on his view of the Anderson factors as mandatory to a finding of premeditated murder,

6   petitioner, citing Keating v. Hood, 191 F.3d 1053 (9th Cir. 1999), argues his due process rights were

7   violated when the trial court convicted him without finding, beyond a reasonable doubt, every

8   necessary element to support the conviction. This, he argues, was not harmless error because such a

9   finding is contingent upon the additional determination that sufficient evidence supports the trial

10  court's verdict.

11  The State maintains that petitioner misrepresents the trial court's premeditation analysis.

12  The trial judge, it argues, cited not only petitioner's past general threats to kill Omar but evidence of

13  his prior attempt to kill her only two months earlier,[4] the volatile, demeaning, vicious and harsh

14  relationship petitioner had with Omar as well as her own actions immediately prior to her death,

15  which a witness had testified were aimed at pleasing petitioner rather than inviting an angry

16  response.[5] The State also argues that petitioner improperly relies on an erroneous challenge of the

17  trial court's application of state law. The State cites the California Supreme Court's more recent

18  statements interpreting the Anderson factors in People v. Perez, 2 Cal. 4th 1117 (1992), which it

19  argues advises against accepting petitioner's reading of Anderson.

20  The California Court of Appeals agreed with the State's analysis of the law, explaining that

21  in Perez the California Supreme Court held that the specific categories described in Anderson were

22  not a "sine qua non to finding first degree premeditated murder, nor are they exclusive." Resp.'s

23  Opp., Exh. I at 8 (quoting Perez, 2 Cal. 4th at 1125). Instead, the California Supreme Court said that

24  "Anderson did not purport to establish an exhaustive list that would exclude all other types and

25  combinations of evidence that could support a finding of premeditation and deliberation" and it

26  treated the categories as guidelines for determining whether a killing has been the result of "careful

27  thought and weighing of considerations for and against the proposed course of action." Perez, 2 Cal.

28

11

4th at 1123, 1125. Proceeding in a manner consistent with <u>Perez</u>, petitioner's trial judge stated that he had "made reference to guiding principles referenced in CALJIC," that for a killing to be deliberate "it must have been formed as a result of careful thought and weighing of considerations for and against the proposed course of action" and that "the true test of deliberation is the extent of reflection." CT 504–07. Based on this, the appellate court affirmed the trial court's application of state law.

In reviewing the manner in which the trial judge applied the appropriate state law to the facts, the appellate court noted that petitioner "had threatened to kill [his victim] by 'cutting' her, virtually the same manner in which he committed the murder." Resp.'s Opp., Exh. I at 8. It also cited the fact that he had stabbed her 23 times, "including a wound to the chest that alone would have been fatal," citing <u>People v. Hillery</u>, 62 Cal. 2d 692, 703–04 (1965), and <u>People v. Perrotta</u>, 224 Cal. App. 2d 505 (1964), for the propositions, respectively that "plunging a lethal weapon into the chest evidences a deliberate intention to kill" and "severe and numerous wounds require[] more than a fleeting period of time to inflict." The appellate court concluded that the nature and extent of the injuries petitioner inflicted on his victim coupled with his prior threats of violence supplied sufficient evidence in the record to justify the trial court's finding of premeditation and deliberation.

This court finds nothing unreasonable in the California Court of Appeal's interpretation of the facts, and petitioner has not argued that the state law is inconsistent with federal standards for determining the existence of premeditation or that the state standard is less protective of his rights.[6] Instead, petitioner argues that <u>Perez</u> and other cases interpreting the <u>Anderson</u> factors should be considered factually distinguishable from his case because specific evidence of unhurried or calculated action was more plentiful in those cases. <u>See, e.g.</u>, <u>Perez</u>, 2 Cal. 4th at 1126 (defendant had parked car away from victim's home, "surreptitiously entered," and in the course of killing broke one knife and had taken pause to retrieve a second), <u>People v. Sanchez</u>, 12 Cal. 4th 1, 18 (defendant and accomplice cooperated—one helping to restrain while the other stabbed). However, this court is required to give appropriate deference to reasonable findings of fact and applications of state law by the state trial court. It is not this court's role to re-evaluate the facts based on

12

petitioner's disagreement with the state court's analysis.  Nor is it proper for this court to second-guess the state appellate court's application of state law.  Therefore, this court holds that the state proceedings were not so flawed as to have been fundamentally unfair in violation of petitioner's due process rights.

B.      "Unconsidered Rash Impulse"

Petitioner claims, again without citation to the record, that the trial judge equated "unconsidered rash impulse" with "lack of provocation" in discord with CALJIC 8.20 and state law.  CALJIC 8.20, petitioner relays, emphasizes the contrast between cold, calculated judgment and decision with an unconsidered rash impulse.  He asserts that finding a lack of provocation is not sufficient to support finding deliberation and premeditation, and he thus argues that because instructions that a reasonable juror could interpret as shifting the burden of proof violate due process, his rights have been so violated.

The State relies upon the Court of Appeal's determination that this argument is without merit because, on the whole, the trial court's statements show no misunderstanding of the law.  The State cited the trial judge's relevant remarks that "[t]he Court is asked to accept on the one hand that based upon a volatile, demeaning, vicious and harsh relationship that Mr. Morales was pushed to the breaking point and that he killed upon an unconsidered and rash impulse."  Resp.'s Opp., Exh. I at 9.  The appellate court concluded that such remarks "reflect that [the trial court] considered the evidence presented in light of the theories presented and determined that the killing constituted first degree murder."  Id.  Petitioner argued at trial that his tumultuous relationship with his victim should be considered evidence that he may have had reason to become angry with her and suddenly engage in an unpremeditated act of violence against her.  The appellate court reasonably interpreted the trial court's comments as referring to petitioner's own theory of the case.

Moreover, the trial judge stated that there was "overwhelming direct and circumstantial evidence that the critical element of expressed 'malice aforethought [was] proven beyond a reasonable doubt.'"  CT 509.  The State provides the court elaboration on this point:

13

1
2
3
4
5

Omar suffered 23 stab wounds on her face, neck, back and chest. There was evidence that petitioner was jealous of Omar and did not want her to look too beautiful. The wounds to her face show a deliberated and calculated intent to disfigure her. Omar screamed and honked the horn several times when petitioner was attacking her; each time her screams were cut short. There was also evidence that Omar attempted to get out of the car to escape the attack: petitioner got out of the car, went to the passenger side, and struggled to close the door. After petitioner drove from the scene, Omar fell from the car. Petitioner callously picked her up and literally threw her motionless body back in the car.

6   Resp.'s Opp. at 22.

7        Petitioner's trial was before a judge, not a jury. The trial judge is presumed to have

8   understood correct legal standards in the absence of evidence in his statements to the contrary. In

9   light of the evidence on record and theories presented by petitioner at his trial, the appellate court

10  reasonably concluded that no statements of the trial judge indicate the court misunderstood the law.

11  It was therefore appropriate that the appellate court rejected petitioner's claim, and this court will

12  similarly deny relief.

13

14        C.      Defense of "Unreasonable Belief of Self Defense"

15        Petitioner next contends that the trial court did not adequately consider evidence of

16  unreasonable or imperfect self defense. For support, petitioner cites to People v. Uriarte, 223 Cal.

17  App. 3d 192, 198 (1990), which requires that a judge instruct a jury on the meaning of the defense

18  where some evidence has been presented to support it. He claims that testimony from witnesses that

19  the victim at some time told petitioner she would "kick [his] ass," and the fact that some of

20  petitioner's blood was found on the knife which he used to stab her, should have sufficed to require

21  an instruction about the defense.

22         The State maintains that the only evidence petitioner presented regarding Omar's ability to

23  do him harm was that she had at some point in their relationship told him she had "the capability

24  through friends and family to have his ass kicked." RT 752. Omar herself was five feet, one inch

25  tall and weighed only 110 pounds. Id. at 159. Petitioner appears to have presented no evidence as

26  to what could have made him either rationally or irrationally fearful of his victim on the evening of

27  the killing. DNA testing admitted during the trial did indicate petitioner could not be excluded from

28

14

"minor types of blood" collected from the knife used in the killing; however, the State points out that many of the stab wounds petitioner inflicted on Omar required "a great deal of force"—so much so that "the blade of the knife was bent"—so it would not be unreasonable to conclude that he might have incurred some minor cuts, which would have caused some amount of his blood to end up on the knife. Id. at 132, 454.

Further, the State suggests that imperfect self defense is essentially equivalent to finding that a killing was a form of voluntary manslaughter, and that the court was not required to consider sua sponte this lesser included offense because of a lack of substantial evidence that defendant killed Omar in unreasonable self defense.

The Court of Appeals cited the trial court's statement that it was "convinced beyond a reasonable doubt that the wounds were not inflicted in self-defense," and it stated it was satisfied that the trial court properly applied and followed the law. Resp.'s Opp., Exh. I at 10. It cited California Evidence Code ("CEC") section 664, which in relevant part provides: "[I]t is presumed that official duty has been regularly performed." Id. at 9.

Again, the appellate court conducted the appropriate analysis; a judge sitting in place of a jury is presumed to know the law. Walton, 497 U.S. at 653. Petitioner's reliance on Uriarte is nonsensical in the context of appeal from a bench trial, in which there is no jury to instruct. The only question is whether the judge himself considered correct legal standards and weighed the evidence correctly, and nothing in the trial record indicates he did not. Rather, the trial court appears reasonably to have concluded that self defense—reasonable or otherwise—was not the motivation of defendant's actions based on the weight of the evidence. Petitioner stabbed Omar no less than 23 times, the strikes were wilfully inflicted upon her back, front, and face, and time elapsed between cuts. CT 506. There is no indication that the court failed to entertain petitioner's defense or consider relevant evidence. For these reasons, this court finds the Court of Appeal's rejection of petitioner's claim appropriate.

15

D.      Evidence of Provocation or of a "Rash, Impulsive Act"

Petitioner argues next that the trial court erred in finding no evidence of provocation or of a rash, impulsive act. He suggests that because witness accounts that Omar's screams during the killing came 10 to 15 seconds apart and because he was extremely distraught after the killing, evidence existed which supported impulse. He claims the trial court erred in requiring proof of provocation to support a finding that he acted in a rash, impulsive manner, and he argues that the trial court impermissibly shifted the burden of proving he acted in a rash, impulsive manner to the defense in violation of his due process rights.

The State contends petitioner takes the trial court's words out of context. The Court of Appeal agreed with the State and rejected petitioner's claim. At trial, petitioner relied on his own assertion that some provocation sparked the rash, impulsive act of killing. In context, the trial judge stated:

> Several scenarios have been proposed. Defense suggested the evidence shows a
> volatile, physical, abusive and self destructive relationship. And something happened
> in the car to force a rash, impulsive act by Mr. Morales. While of course, possible,
> there is no evidence to support this version. While acknowledging a mercurial
> temperament, all the evidence points to a vibrant young woman out for a happy
> celebration.

CT 508.

The appellate court held that the trial court's comments "[do] not demonstrate that the court placed the burden upon defendant of introducing direct evidence of provocation in the car" but that the trial court "was simply reviewing the evidence and theories presented and giving its conclusion that the evidence failed to support defendant's theory." Resp.'s Opp., Exh. I at 10. The court reasonably deemed the relevant statements made by the trial judge to be a rejection of petitioner's theory that Omar provoked him to act in a rash, impulsive manner—not a requirement that petitioner prove an act of provocation to demonstrate impulsive behavior sufficient to escape a first degree murder conviction. Id. This court agrees. Petitioner's contention that there was some evidence supporting a rash act which the trial court ignored is not supported by the record; rather, as the state courts both found, the weight of the evidence in the case, much of which has already been discussed, convinced the trial judge beyond a reasonable doubt that petitioner committed premeditated and

1    deliberate murder.  Petitioner was not forced to carry an inappropriate burden; he failed to raise

2    sufficient facts to negate the prosecution's showing.  Because this court finds the determination by

3    the appellate court to be reasonable, petitioner's argument fails and no error is assigned.

4

5    II.      Evidentiary Determinations

6          Petitioner asserts that the trial court impermissibly: (1) admitted harmful testimonial hearsay

7    evidence of his deceased victim; (2) admitted a similarly damaging prior statement given to the

8    police by Michael Tong; and (3) excluded evidence of Omar's past violent acts.  The State

9    argues that: (1) admission of statements previously made by Omar to police were reasonable

10   pursuant to CEC section 1370; (2) petitioner waived objections to the admission of Michael Tong's

11   statements; and (3) the trial court properly excluded evidence of the victim's alleged prior violent

12   conduct.  The Court of Appeal reviewed petitioner's claims, and determined that the trial court

13   committed no error.

14

15         A.      Admission of Omar's prior statements

16         At trial, Nelva Omar's statements made to the police about prior acts of misconduct by

17   petitioner on four separate occasions were admitted into evidence pursuant to CEC section 1370.[7]

18   These statements narrated threats made by petitioner to Omar at various times.  CT 422.  Petitioner

19   has challenged the admission of these statements, claiming a violation of his right of confrontation

20   under the Sixth Amendment because he had no opportunity to cross-examine Omar about the

21   statements.[8]

22         The State contends that admission of the prior statements was reasonable because petitioner

23   forfeited his right of confrontation, and alternatively, the statements were properly admitted under

24   the standard set forth in Crawford v. Washington, 541 U.S. 36 (2004), as refined by the United

25   States and California Supreme Courts in Davis v. Washington, 547 U.S. 813 (2006), and People v.

26   Cage, 40 Cal. 4th 965 (2007).  The State further argues any potential error was harmless because the

27   question of Morales' identity as the person who killed Omar was not at issue.

28

17

In response to the State's forfeiture argument petitioner urges this court to impose a specific intent requirement into the equitable rule of forfeiture. Petitioner claims he cannot be deemed to have forfeited his right to confrontation unless he killed Omar in order to specifically keep her from testifying at trial. In support of this position, petitioner cites Federal Rule of Evidence ("FRE") 804(b)(6), which requires a showing that the party against whom a statement has been offered "has engaged or acquiesced in wrong-doing that was intended to, and did procure the unavailability of the declarant as a witness." Petitioner cites to various cases and official commentary to the rule which bolster the argument that FRE 804(b)(6) requires a specific intent to make a witness unavailable.

The Court of Appeal deemed petitioner's right of confrontation forfeited pursuant to Crawford and Reynolds, and cited cases from other circuits to illustrate the appropriateness of the forfeiture exception despite a lack of specific intent to make the witness unavailable.[9] Resp.'s Opp., Exh. I at 10–13. This court agrees with the appellate court's conclusion and finds that petitioner forfeited his right to confront Omar when he killed her.

Petitioner's forfeiture argument, although superficially logical, is untenable because petitioner errs by conflating the common law rule of equitable forfeiture of the right of confrontation with the more recently developed and distinct FRE 804(b)(6). The rationale for rejecting petitioner's argument was succinctly stated by the California Supreme Court in the case of People v. Guiles, 40 Cal. 4th 833 (2007).[10] That court recognized that the United States Supreme Court reaffirmed an equitable forfeiture exception to the right of confrontation in Crawford, as it was originally defined in the case of Reynolds v. United States, 98 U.S. 145 (1879). Id. at 840–41; see also Crawford, 541 U.S. at 62 n. 9 ("rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds"). The court then reasoned that equity should not allow another to take advantage of his or her own wrong; and, additionally, explained that the equitable rule referred to in Crawford is one of forfeiture, rather than waiver, and therefore does not require the same element of intent that must be shown to trigger application of FRE 804(b)(6). Guiles, 40 Cal. 4th at 849–49 (citing Reynolds, 98 U.S. at 159 ("no one shall be permitted to take advantage of his own wrong" and "if a witness is absent by his own wrongful

18

procurement, he cannot complain if competent evidence is submitted to supply the place of that which he has kept away")); <u>United States v. Garcia-Mendez</u>, 403 F.3d 364, 370 (6th Cir. 2005) (Supreme Court's rationale for affirming rule of forfeiture "strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive."); <u>United States v. Olano</u>, 507 U.S. 725, 733 (1993) ("forfeiture" and "waiver" are distinctly different terms); <u>Freytag v. Commissioner</u>, 501 U.S. 868, 894–95 ("Waiver, the 'intentional relinquishment or abandonment of a known right or privilege' is merely one means by which a forfeiture may occur. Some rights may be forfeited by means short of waiver.") (citations omitted)).

The equitable principle of not rewarding wrongdoing and recognizing that the exception at issue is one of forfeiture rather than waiver both negate requiring specific intent to make a witness unavailable when a defendant has caused the unavailability of that witness. When an exception to the hearsay rule would otherwise make a statement admissible, the Confrontation Clause does not stand as a bar if the defendant is responsible for the unavailability of the declarant.

Here, it is undisputed that petitioner killed Nelva Omar. Although statements made on at least three of the four occasions in question were potentially testimonial in nature, the statements were all properly admitted pursuant to CEC section sections 1370 and 1240.[11] This court finds that the state appellate court correctly found that petitioner suffered no constitutional error by the admission of Omar's statements at trial.

B.     Admission of Michael Tong's statements

Petitioner argues that the trial court impermissibly admitted a prior statement by Michael Tong—a former highschool classmate of petitioner—made to the police in October 1998. The statement acknowledged that he had met petitioner's girlfriend—most likely Omar—and provided some minimal description about her. It also acknowledged that petitioner had told Tong he suspected his girlfriend of cheating, and that during an argument petitioner had thrown his girlfriend on the bed, began to choke her and considered smothering her with a pillow. RT 198. The statement was admitted because Tong testified that although he remembered talking to sheriff

1  deputies on several occasions and recalled meeting petitioner's girlfriend, he did not recall speaking

2  to the police on the particular date when the statement was made. Tong maintained that he probably

3  made and signed a statement about petitioner, and that the statement was truthful. The trial court

4  admitted the statement pursuant to CEC section 1237 as a past recollection recorded.[12]  Petitioner

5  argues that admission under section 1237 was inappropriate because Tong had been a drug user for

6  nearly 10 years and that his statement was not fresh.

7          The State asserts that petitioner explicitly waived objection to the admission of Tong's

8  statement so he is therefore procedurally barred from complaint. Alternatively, it argues that the

9  admission of Tong's statement was not prejudicial because petitioner was able to and did cross-

10  examine Tong about the statement. Moreover, the State argues any error that might be assigned

11  should be deemed harmless because Tong's statement was only one of many pieces of evidence

12  demonstrating petitioner had been physically abusive and threatening towards Omar.

13          The Court of Appeal accepted the State's waiver argument. It relied upon the fact that

14  although petitioner initially moved to strike Tong's testimony on redirect, wherein Tong admitted he

15  told the deputy sheriff the facts in his statement, petitioner subsequently appears to have withdrawn

16  the initial objection. Resp.'s Opp., Exh. I at 15. After the parties had rested, the Court of Appeal

17  noted that in the context of discussion about evidentiary motions, and specifically in relation to

18  Tong's testimony, the prosecution stated, "I don't know if counsel is still objecting to the

19  admissibility of that testimony," and that in reply, petitioner's counsel said "No." Id.  The appellate

20  court also cited the trial court's statement that "[t]here being no objection, there's no issue." Id.

21          This court finds no error in the appellate court's determination that waiver occurred at trial.

22  The conclusion was reasonable based on the cited statements made by counsel and the trial court

23  judge, and the result does not impose any stricter standard than is recognized by federal law. See

24  Peretz v. United States, 501 U.S. 923, 936–37 (1991) ("No procedural principal is more familiar to

25  this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the

26  failure to make timely assertions of the right before a tribunal having jurisdiction to determine it.").

27

28

20

C.    Exclusion of Omar's prior conduct

Petitioner argues that the trial judge erred in not admitting evidence regarding a particular instance in which Omar struck and injured another individual with her car during a dispute with another girl in high school.  He cites CEC section 1103, which provides that evidence of a character trait may be introduced through evidence of a specific instance of conduct.[13]  The State argues that the evidence was appropriately deemed irrelevant and unduly prejudicial by the trial court, and excluded within the court's discretion.

The trial court excluded the evidence for lack of relevance because it did not relate directly to Omar's relationship with petitioner, didn't touch upon her credibility, and because, having occurred three years prior, it was too remote in time to show that Omar had any significant propensity for violence.  The court concluded that because the testimony would have "negligible weight" it would be "ultimately meaningless."  RT 718.

The Court of Appeal upheld the trial court's determination.  It held that CEC section 352 allows a trial court to preclude admission of evidence pursuant to section 1103 if "the evidence and the danger of prejudice, confusion and undue time consumption" substantially outweigh the probative value of the evidence.  Resp.'s Opp., Exh. I at 15–16.  Acknowledging the California Supreme Court's statement in People v. Wright, 39 Cal. 3d 576, 588 (1985), that "the danger of these evils" must "substantially outweigh the probative value of the evidence," the appellate court then reviewed the trial court's decision for abuse of discretion, citing People v. Rodriguez, 20 Cal. 4th 1, 9–10 (1999), and determined that because there was already ample evidence that Omar and petitioner were abusive toward one another and argued frequently and because the testimony was "weak and contradicted in cross-examination," the trial court had properly ruled the evidence inadmissible.

The State argues that although the Sixth and Fourteenth Amendments guarantee petitioner a meaningful opportunity to present a complete defense, not every unfavorable evidentiary ruling, even if erroneous, is a constitutional deprivation, and that "the Constitution permits judges to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment,

prejudice, or confusion of the issues." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326–27 (2006)

(internal quotations omitted); <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42–43 (1996) (defendants do not

have unfettered right to offer evidence); <u>Dowling v. United States</u>, 493 U.S. 342, 352–54 (1990)

(prejudice of evidentiary ruling determined by rules of evidence rather than concept of due process);

<u>Jammal v. Van De Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991) ("We are not a state supreme court of

errors; we do not review questions of state evidence law. On federal habeas we may only consider

whether the petitioner's conviction violated constitutional norms.")

The appellate court's determination appears to have been reasonable in light of the state rule

of evidence applied, which does not appear to violate any federal constitutional standard.  Petitioner

has failed to show that the court's admission was for any reason so unfair as to have violated his

right to due process.  Therefore, this court declines to find any error in the appellate court's approval

of the trial court's discretionary decision to exclude the evidence.

III.    <u>Prosecutorial Misconduct</u>

Petitioner next asserts that he was unduly prejudiced by several statements made by the

prosecutor during the closing arguments, which he argues denied him his right to a fair trial.

Specifically, petitioner claims the prosecutor: (1) accused defense counsel of presenting a bad-faith

defense; (2) appealed to passion and prejudice—urging the judge to overlook the law; and

(3) imposed testimony by body language by commenting on petitioner's demeanor when sitting in

court.

The State argues that petitioner's claim is procedurally barred because petitioner failed to

object at the time of the alleged misconduct.  Moreover, the State asserts that if considered on the

merits—even if viewed cumulatively—any comments the prosecutor made should be considered

harmless because there was no prejudicial effect upon the bench trial proceedings.

The Court of Appeal found for the State on the basis of petitioner's failure to object, citing

<u>People v. Cunningham</u>, 25 Cal. 4th 926, 1000–01 (2001) (a claim is preserved only when a

defendant timely object and requests a curative admission), and <u>People v. Scott</u>, 15 Cal. 4th 1188,

1217 (1997) (same is true in a proceeding before the court rather than a jury). The court also deemed the prosecutor's statements—although acknowledging that some were improper[14]—harmless because during this bench trial the judge was less likely to be significantly affected by the prosecutor's statements. Moreover, the court addressed the merits of each of petitioner's particular claims, and found that only one of the three was actually misconduct.

Petitioner asserts that the following comments by the prosecutor in rebuttal argument improperly implied that defense counsel fabricated a defense: "The defense knows perfectly well that the evidence in this case is that this is a crime of murder. The defense knows perfectly well that this is not a manslaughter. There is no evidentiary basis to support manslaughter. This is a murder." RT 780. Petitioner cited two California Supreme Court cases and one state appellate court case for precedent to support the claim that the prosecutions comments about bad-faith defense were misconduct: People v. Bain, 5 Cal. 3d 839, 847 (1971); People v. Nolan, 126 Cal. App. 623, 641 (1932); and People v. Perry, 7 Cal. 3d 789 (1972). However, the Court of Appeal—citing the more recent California Supreme Court case People v. Hill, 17 Cal. 4th 800, 819 (1998)—found that on this point the prosecutor had merely made "fair comment on the evidence." In Hill, the Court held that "[c]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." Id. The Court further explained that

> a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature. A prosecutor may vigorously argue his case and is not limited to "Chesterfieldian politeness", and he may use appropriate epithets . . . .

Id. This court finds the prosecutor's statements to be vigorous advocacy and holds that the appellate court below was not unreasonable in finding petitioner's statements proper in light of Hill.

Petitioner's claim that the prosecution appealed to the trial judge's passion and prejudice is also misguided. Petitioner points to the prosecutor's statement that petitioner's defense was merely an "intellectual exercise" and a "charade." However, petitioner cites cases which condemn calls for

a jury to "make a statement," <u>United States v. Weatherspoon</u>, 410 F.3d 1142, 1149 (9th Cir. 2005), "send a message" to society at large, <u>United States v. Solivan</u>, 937 F.2d 1146, 1153 (6th Cir. 1991), or "be the conscience of the community" when such appeal is "specifically designed to inflame the jury," <u>United States v. Koon</u>, 34 F.3d 1416, 1443 (9th Cir. 1994). These cases are factually distinguishable from petitioner's and therefore do not lend support to petitioner's argument. The Court of Appeal reasonably determined the statements did not constitute misconduct but merely critiqued defense counsel's presentation of the case.

As for comments with regard to petitioner's passive courtroom demeanor, petitioner cites to <u>United States v. Schuler</u>, 813 F. 2d 978, 979 (9th Cir. 1986), and other cases in which several circuit courts have deemed it reversible error to allow comment on a defendant's off-the-stand behavior. However, the Court of Appeal did not deny this behavior was misconduct; it found that such misconduct was not prejudicial because, unlike cases such as <u>Schuler</u> where improper comments were made to a jury, the comments made before the judge at petitioner's bench trial could not be presumed to have the same prejudicial effect.

This court finds that the Court of Appeal properly analyzed petitioner's misconduct claims. It followed California Supreme Court precedent in determining that petitioner's failure to raise objection at the time the statements were made precludes his subsequent challenge of the statements, and this result does not conflict with federal law. Additionally, the appellate court nonetheless analyzed each of petitioner's claims, but based on the reasons mentioned found only one claim to have merit. This court is satisfied with the appellate court's ultimate conclusion that even that claim—were it not barred by petitioner's failure to object—could not be considered harmful because under the <u>Brecht</u> standard, petitioner must show that the trial judge was significantly influenced by the prosecutor's comments; in light of the overall record, this court cannot say that such actual prejudice occurred.

IV.     Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants the right of "effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 684–85 (1984) (quotation ommitted). Counsel is required to provide "reasonably effective assistance" from an objective standpoint. Id. at 687. In Strickland, the Supreme Court defined the test for determining whether effective assistance of counsel has been denied:

> First, the defendant must show that counsel's *performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the *deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. (emphasis added).

A.     Petitioner's Claims

Petitioner's ineffective assistance of counsel claim is based on two allegations of failure on his attorney's part. First, that his counsel did not object to inappropriate comments made by the prosecutor during closing arguments of petitioner's trial; and second, that his attorney failed to investigate the origin of the weapon petitioner used in the commission of his crime. Petitioner contends that his counsel's failure to object could not have been an intentional strategic decision, and he argues that the failure to investigate foreclosed the possibility that counsel might have discovered evidence undermining the government's proof of premeditation and deliberation.

The Court of Appeal rejected petitioner's claims of ineffective assistance of counsel, finding that counsel's failure to object was not prejudicial because "any prosecutorial misconduct was harmless." Resp.'s Opp., Exh. I at 19. As to the failure to fully investigate the origin of the murder weapon, the appellate court determined that "[t]he facts alleged in the petition do not prove that defense counsel failed to investigate the origin of the knife; only that he did not ask defendant's mother about the issue," that "counsel was not ineffective in not pursuing the origin of the knife with

1   defendant's mother," and that even if counsel had been ineffective in this regard, "evidence of the

2   origin of the knife would not have had an effect on the verdict in view of the overwhelming evidence

3   of premeditation and deliberation." Id.

4       This court has already deemed any error resulting from the prosecutor's closing statements

5   was reasonably deemed harmless by the state appellate court. For the same reasons, the court finds

6   reasonable the appellate court's determination that the failure to object to the statements was

7   harmless.

8       This court also finds reasonable the appellate court's determinations regarding the claim of

9   failure to investigate. The appellate court correctly applied the Strickland standard, and in doing so

10  determined that petitioner did not allege facts that if proven true would demonstrate prejudice.

11  Resp.'s Opp., Exh. I at 18–19. Petitioner contends that if it could be shown that the knife he used to

12  kill Omar had been in her car, it would suggest he had not planned to kill Omar. Although this court

13  acknowledges the same is a reasonable inference, petitioner merely suggests that a declaration from

14  his mother "did tend to show" he had not brought the knife because it "was a serrated kitchen knife,

15  petitioner was living at his mother's house at the time of the killing, and his mother declared that no

16  knives were missing from her kitchen." Pet's Reply in Support of Motion for Evid. Hearing at 5.

17  That the common kitchen knife may not have come from his mother's home does not negate the

18  possibility that petitioner obtained it from any number of places other than Omar's car. Moreover,

19  even if petitioner found the knife in Omar's car, petitioner has not shown that the trial court would

20  have drawn petitioner's desired inference in light of all of the other evidence presented at trial.

21  Absent this showing, this court finds the Court of Appeal's holding that any failure to investigate did

22  not rise to the level of ineffective assistance of counsel, or if it did it was nonetheless harmless, was

23  reasonable.

24

25      B.      Petitioner's Motion for Evidentiary Hearing

26      On September 27, 2007 petitioner filed a motion for evidentiary hearing pursuant to Rule 8

27  of the Rules Governing Section 2254 cases ("Rule 8") and Local Rule 2254-7, based on his asserted

28

1   need for further expansion of the record to support his claim of ineffective assistance of counsel.

2   Relying on <u>Earp v. Ornoski</u>, 431 F.3d 1158 (9th Cir. 2005), petitioner argues he is entitled to an

3   evidentiary hearing because he has presented a colorable claim of ineffective assistance of counsel

4   and the state court's decision was based on an unreasonable determination of facts.

5          In an opposition motion submitted on October 1, 2007 the State argued that a hearing should

6   not be granted for three reasons. First, petitioner is not entitled to such hearing because he has not

7   met the requirements of 28 U.S.C. section 2254(e)(2). Section 2254(e)(2) requires petitioner to have

8   developed the factual basis for his claim in state proceedings, or in the alternative to show that a new

9   rule of constitutional law or new factual predicate is the basis of his claim. Second, even if the

10  factual allegations were established to be true, they would not support a finding that the offending

11  conduct was prejudicial. Third, petitioner did not comply with local rule 2245-7(a), which requires

12  both that a request for an evidentiary hearing be made within 15 days from the expiration of the time

13  for filing a traverse and that the request specify which factual issues in particular require a hearing

14  and what evidence will be offered.

15         The State correctly points out that petitioner has not complied with the timing requirements

16  of the local rule for filing his request. However, petitioner counters that the court has an

17  independent duty under Rule 8 to determine whether an evidentiary hearing is warranted—whether

18  mandatory or merely desirable. Petitioner also asserts his failure to request an evidentiary hearing in

19  the state court proceedings is excusable because he had no practical ability to make such a request

20  since the state appellate court never issued an order to show cause, which he argues was a necessary

21  precursor to raising the issue.

22         Claims which can be resolved on an existing record do not warrant a federal evidentiary

23  hearing. <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1078 (9th Cir. 1999). Although mindful of its

24  obligations, this court will not grant petitioner an evidentiary hearing because the court finds the

25  factual determinations made by the appellate court below in resolving the ineffective assistance of

26  counsel claims to be reasonable for the reasons previously stated. <u>See</u> <u>Earp</u>, 431 F.3d at 1166–67

27  ("Because a federal court may not independently review the merits of a state court decision without

28

first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts."). Petitioner has failed to sufficiently demonstrate what, if any, new facts could be established during such a hearing that would undermine the reasonable determination of the Court of Appeal below that the offending conduct, even if true, was not prejudicial.

V.      Cumulative Error

       This court recognizes that in some instances it is appropriate to consider the cumulative effect of several errors that otherwise viewed separately would not result in a sufficient degree of prejudice to warrant reversal. See Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir. 2003). Petitioner, however, is unable to establish any federal constitutional error whatsoever, let alone an accumulation of errors. Therefore, no basis for finding cumulative error exists. See Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999) (where no single constitutional error exists "nothing can accumulate to the level of a constitutional violation."); accord Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.").

CONCLUSION

       Because petitioner has failed to demonstrate any error rising to the level of actual prejudice, or any combination of errors that taken together rise to such level, the petition for writ of habeas corpus is DENIED.

       IT IS SO ORDERED.

Dated: February 13, 2008

                                              _____
                                              MARILYN HALL PATEL
                                              United States District Court Judge
                                              Northern District of California

1. "CT" refers to the clerk's transcript of petitioner's state court trial, which this court received as Exhibit A in support of Respondent's Opposition Brief. "RT" refers to the reporter's transcript of the trial, which this court received as Exhibit B in support of Respondent's Opposition Brief.

2. The California Supreme Court actually referred to case number S12737. This case number was assigned to a related case, but appears to have been referenced in error.

3. In its entirety, CALJIC 8.20 reads as follows:
All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.
The word "willful," as used in this instruction, means intentional.
The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.
If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.
The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.
The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.
To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] [she] decides to and does kill.

4. East Bay Regional Park Police Chief Norman LaPera testified having pulled up next to petitioner and Omar on Redwood Road at Castro Valley Boulevard on August 2, 1998, where he could hear Omar crying, saying "no" and "leave me alone," and that when he made eye contact with her, she mouthed the words "help me." RT 522–28, 532. He further testified that he stopped petitioner's vehicle, at which time he witnessed Omar run from the car to the back seat of his own car while petitioner ran towards her, saying he was going to hurt her and swearing at her. Id. at 529–530. Upon pulling into a strip mall at the side of the intersection, Omar continued to cry and told LaPera several times that petitioner had told her he was driving up the road to kill her. Id. at 531–32. Once both vehicles were parked, LaPera said petitioner continued to yell at Omar and

UNITED STATES DISTRICT COURT
For the Northern District of California

ultimately had to be restrained and placed in another police car.  Id. at 535–36.  LaPerla testified that Omar continued to be upset, and repeatedly stated petitioner was taking her up the road to kill her. Id. at 535.  Omar had a three-inch abrasion on the back of her neck and a smaller one on the front of her neck, as well as superficial scratches on her neck and wrists.  Id. at 179.  In his discussion of premeditation, the judge stated, "[petitioner] once had even beaten Miss Omar while driving during the – toward the empty reaches of Redwood Road, telling her he was taking her there to kill her. Perhaps the fortuitous intervention of Chief Perrea [*sic*] saved her."  CT 506.

5.      The judge stated that "[t]he evidence shows that Miss Omar, in a celebrating frame of mind, dressed in party clothes, was planning on a special night out with her boyfriend . . . .  She dressed in clothes that were specifically chosen not to upset Mr. Morales."  CT 507–08.

6.      The State correctly argues that the law applied conforms to the equivalent federal law for determining premeditation.  Specifically, the State points to United States v. Free, 841 F.2d 321, 325 (9th Cir. 1988), in which the Ninth Circuit held that premeditation may be established by "circumstantial evidence and inferences drawn from it," including but not limited to consideration of a defendant's "prior relationship to the victim, the defendant's carrying of the murder weapon to the scene, and the manner of the killing."

7.      CEC 1370 provides for the introduction into evidence the hearsay statements of a declarant "if all of the following conditions are met":
        (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.
        (2) The declarant is unavailable as a witness pursuant to Section 240.
        (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.
        (4) The statement was made under circumstances that would indicate its trustworthiness.

8.      Petitioner did not object to the admission of these statements at trial on the basis of inability to confront because at the time of trial the Supreme Court had not yet decided Crawford v. Washington, 541 U.S. 36 (2004).  As the state appellate court held, it is appropriate to excuse this lack of objection on the basis that such objection would have been "unsupported by substantive law then in existence."  People v. Welch, 5 Cal.4th 228, 237 (1993).  This court, however, considers the facts of petitioner's case in light of the rules of confrontation set forth in Crawford because that case was decided while petitioner's direct state appeal was pending.  See Linkletter v. Walker, 381 U.S. 618, 627 (1965) ("a change in law will be given effect while a case is on direct review").

9.      The court cited United States v. Emery, 186 F.3d 921, 926 (8th Cir. 1999), and State v. Meeks, 88 P.3d 789, 794 (Kan. 2004).

10.     This court notes, but does not rely on, the holding in Guiles.  The court agrees with the analysis put forth by the Guiles court and cites it for illustrative purposes.

30

UNITED STATES DISTRICT COURT
For the Northern District of California

11.     The court notes, but finds no need to address, petitioner's objection based on People v. Kons, 108 Cal. App. 4th 514 (2003), that CEC section 1370 has been deemed not to qualify as a firmly rooted, reliable hearsay exception under the test of Ohio v. Roberts because that test is no longer applicable.  The Court of Appeal noted that, based on the evidence in the record, the trial court did not err in ruling that the statements were sufficiently trustworthy to meet the fourth requirement for admission under 1370.  It found that the trial court reasonably deemed the statements trustworthy for this purpose based on the lack of pending litigation, the fact that Omar's injuries were consistent with her complaints, and that although she "may have had bias or motive for fabrication due to her increasingly volatile relationship with [petitioner], her demeanor at the time of the reports suggested she was more likely to be credible."  Resp.'s Opp., Exh. I at 13–14.

12.     CEC 1237 provides:
(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:
(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;
(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;
(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and
(4) Is offered after the writing is authenticated as an accurate record of the statement.
(b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party.

13.     CEC 1103 provides:
(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is:
(1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character.
(2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1).

14.     The prosecutor commented on petitioner's courtroom demeanor—saying that petitioner had a "smug little look on his face" and was pouting—in a manner that petitioner argued below constituted unfair comment on his choice not to testify.  The appellate court acknowledged that these comments were improper pursuant to state law, citing People v. Boyette, 29 Cal. 4th 381, 434 (2002).

31